May it please the court. At sentencing, the government called its case agent to testify. This was the case agent who was in charge of the investigation, who conducted surveillance on Mr. Galeas after the investigators had contacted him to make a controlled purchase of cocaine on five different occasions, who conducted surveillance at his house before and after those controlled purchases. That agent testified that Mr. Galeas employed my client Mr. Silva to conduct discrete deliveries as part of his cocaine business. He specifically testified that there was no evidence that Mr. Silva was involved in the two transactions when his co-conspirators sold cocaine to the undercover source, and he also specifically testified that there was no evidence that Mr. Silva had access to the cache of cocaine in Mr. Galeas's attic, and that there was no evidence that he even knew that that cache of cocaine existed. Nonetheless, the district court held Mr. Silva responsible for the entirety of the cocaine that Mr. Galeas was responsible for, not only the 600 grams in Mr. Galeas's attic, but also two deliveries of 28 grams, one made by Mr. Galeas in October of 23, and the other one made by a man named Mr. Ramon in November of 23. The district court's side is it is reasoning for enhancing Mr. Silva's sentence that it was not certain that Mr. Silva's involvement was reflected in the evidence. Specifically, the district court speculated, I keep coming back to I don't know that the total that we're talking about here is outside the universe of what Mr. Silva's doing. If we knew the evidence was that he had done what he did in this case, then I'd start second-guessing myself. So here we have the district court doing specifically what this court has counseled against it doing in United States v. Connor and others, which is basing a sentencing enhancement on speculation. Speculation as to the existence of facts cannot support a higher guideline sentence, and that's what the district court did here. That is why the district court clearly erred in finding that anything more than 90 grams of cocaine was Mr. Silva's relevant conduct under the sentencing guidelines. The United States urges that that was harmless error, but the United States is not clear which prong of harmless error review it's urging us to proceed under. There was no indication by the district court that the district court considered the correct guideline range as it would have been calculated as if Mr. Silva's relevant conduct was put at 90 grams of cocaine. And just for clarity, at 90 grams of cocaine, Mr. Silva would have been a basal offense level of 14. I think I made a mistake in the briefs and assumed that we would have subtracted 3 for acceptance of responsibility. Because it's 14 below 16, we actually only subtract 2 for acceptance of responsibility. That puts him at a total offense level at 12, and in criminal history category 4, his guideline sentence should have been 21 to 27 months. That correct guideline sentence was never before the district court, so the government can't show harmless error by showing that the district court considered the correct guideline range and chose a sentence outside of it. The other way the government can show harmless error review is by showing that the district court independently arrived at a sentence that it determined was correct in this case, absent the guidelines. The district court did not make any comments to that effect. And you can see where the district court might have arrived at his sentence, at the sentence that it did arrive at, of 60 months, by using the guidelines. Our argument is that the district court erroneously used the offense level of 17. Now, at a category 4, which is where Mr. Silva was, that yielded a recommended sentence of 37 to 46 months. The district court ultimately imposed a sentence of 60 months, which would have been within the range at a category 6. So it's possible that the district court just went across the table and said his criminal history seems to be underrepresented, which was the stated reason for the upward variance, and chose a sentence within a higher criminal history guideline. We don't know that that's what the district court did, and that points to the larger problem, because on harmless error review, the burden lies with the government. The district court simply didn't give any rationale for its ultimate imposition of 60 months. So the government cannot show, meet its burden to show that the error in the guideline calculation did not affect the district court's ultimate sentence. Of course, this court has repeatedly held that an upward variance does not, in and of itself, show that the error was harmless, because it's still possible that the district court did as it's instructed to do, which is start at the guideline range and proceed from there. Let's go back to plausibility of the responsibility for the drugs. Yes, Your Honor. If he pleaded guilty to the conspiracy for the time period, and there's some testimony that he was recruited to distribute during this time period, and Sergeant Rogers says that he knew that Ramon distributed drugs for Gaileas on November 2nd, why isn't that enough to hold him responsible? So I think the guy might... We might not, if we were to independently look at the situation, that might not be enough, but why isn't that plausible, which is a very low standard? Right. So I think your question gets to two issues. So the first is that the guidelines are very clear that it's not about what you plead to or what the conspiracy alleged is to be. It's about what your acts are and what the acts of your co-conspirators are in the conduct that you have agreed to participate in. Now I think, and so the fact that we pleaded to a wider date range conspiracy does not show when we actually joined the conspiracy. It's not determinative of what our acts are. And I'd point the Court to the decision, this Court's precedent in Rivera, where... It would lead to a larger time period if that's not the time period that you were in the conspiracy. So Your Honor, the factual basis was very clear here, that we were disputing the discrete actions within the factual basis. The government alleged a conspiracy starting on one date and ending on another, and we, in order to plead guilty to the indictment, said, yes, we joined that conspiracy. And this was just a straight-up plead guilty to the indictment, wasn't it? There was no deal or anything? That's correct. There was no plea agreement. It was just a factual basis. Okay, go ahead. I'm sorry. Keep explaining why this isn't plausible. No, and the government very clearly, in the factual basis, to their credit, took into account what we disagreed with and dropped footnotes in the factual basis saying, you know, Galeas, or Silva, sorry, Silva disputes this paragraph and reserves his right to contest that at sentencing. But then getting to the second part of your question, which I think is, what was the District Court allowed to extrapolate, especially on clear error review here as to the scope of the conspiracy? Here we have the District Court's permitted extrapolations very cabined, I think, by the testimony of the agent at sentencing. A lot of the court's cases don't deal with, you know, just deal with what the pre-sentence investigation report says. It doesn't deal with live testimony at the sentencing hearing. And here we have the case agent testifying, you know, we have no evidence that Mr. Silva was involved in Mr. Ramon's transaction. We have no evidence that Mr. Silva had anything to do with the cache of cocaine getting into Mr. Galeas' attic, even had knowledge of it. And so that cabins what the District Court can decide, but also this court can look to what the District Court actually said in identifying whether there was clear error here, because the District Court here doesn't say, you know, I see evidence that Mr. Silva was more an employee or a partner of Mr. Galeas. The District Court said, I think that Mr. Silva was doing more than what the evidence shows that he was doing. So the District Court is kind of explicit in overruling our objection that it is speculating that Mr. Silva had, did more transactions, made more deliveries than the evidence suggested. And so I think this court is required to say, you know, this is what the evidence at sentencing showed. The District Court can make reasonable inferences from that, but the inference that Mr. Silva was involved beyond the 90 grams is not justified by, it's contradicted by the evidence from the government's own witness at sentencing. Is this too speculative of an inference? Yes, Your Honor. That's my argument. Anybody have anything? I think we have your argument, which is very succinctly put. Thank you, Your Honor. Is it too speculative of an inference? I do not believe it is not. When you look at the entire record, and I apologize, Laura Durbin for the United States. It's my fault. I think when you look at the entire record here, what Silva urges this court to do is based on a logical fallacy, that the fact that he was only involved in three transactions and there was not evidence of other transactions means that he only agreed to those three, and that was the joint agreement, or the agreement for the joint criminal activity. But that conclusion ignores the evidence on the record. First, it ignores that Silva approached Galeas for work after Galeas started distributing cocaine. Second, it ignores the fact that Silva recruited a third person into the conspiracy, Mr. Ramon. And it also ignores that Silva's conduct was not just limited to drug transactions. He also filled in for Ramon when he could not deliver, and he also picked up payments, the payments for the drug, for the fronted drugs. So the district court had that evidence in front of it, and it was a plausible inference that Mr. Silva's conduct extended beyond those three transactions that Sergeant Rogers knew that he personally was involved in. But it does seem that the district court's own statement is somewhat problematic, perhaps. I know it's very difficult to sentence, and I don't do it daily. The idea that, oh, I just think there's more beyond the evidence, isn't that problematic? I read what the district court is saying is different. What I read the district court saying is this amount, this 755 grams that is the total amount, is not beyond the universe of what Mr. Silva knew. The court goes on to say if it had been multiple kilograms stashed in the attic, well, then it maybe was not a plausible inference for the district court to make that he was agreed to that level of distribution. But here we have less than a kilo that's found, or basically almost a little over half a kilo found in the attic, and that corresponds to these co-conspirators' activity of distributing an ounce every few weeks. And so the criminal activity that they agreed upon was distribute this stash of cocaine in Galeas' house to lower street-level distributors. And that's what each of these defendants' actions are taking, or, excuse me, that are showing, that that's what the agreement was for. And the district court's inference from that conduct to attribute the entire amount to Mr. Silva was not clearly erroneous. And then just briefly, I know that Mr. Silva relies on the guideline commentary, specifically Comet-5 and Comet-7, as a way to, well, not to distinguish, but to show that this conduct was simply like that described in the guidelines. In Comet-5, that's the scenario in which the girlfriend was approached by the boyfriend who's involved in a large conspiracy to distribute, I don't remember what substance it is, but a controlled substance, because the boyfriend was ill. And that's clearly not the case here. Silva approached Galeas to join this conspiracy, and he did not deliver just one time. There was multiple times in which he delivered, which the district court contemplated on page 100 of the record. There was both distribution and collection of payments. And then, unlike the girlfriend in the Comet, Silva recruited another person into the conspiracy. And then defendant, or, excuse me, Comet-7 contemplates the scenario in which the main defendant recruits the lower defendant to distribute 500 grams of cocaine. There, that agreement, the defendant who agreed to distribute the 500 grams, that's what the agreement was limited to. And there's nothing in this record that suggests that Silva just agreed to deliver three times for Galeas. I just wanted to clarify that. How do you distinguish the Smith case? Smith, I think, is distinguishable in several ways. First, there's just one, Smith was, there was just evidence of one transaction for the defendant and Smith, and I believe that defendant's name was Phillip, or Phillips. And Phillips brought customers to the main defendant, and there was just one time on the record that he did that. Here, the evidence is an agreement between Galeas, Ramon, and Silva for multiple times of distribution. And so, Smith is just not particularly helpful for Silva to try and pigeonhole his conduct to the same as the defendant, Phillips, and Smith. Same for Dean? What do you do with the Dean case? I don't know if I'm familiar with the Dean case. Okay. That's okay. I'm sorry. No, no, no, it's at 59 F. 3rd, 1479. So, where they vacated, because there's a disputed drug amount for the joint criminal activity, we vacated four co-defendants. That was the issue, is how much did they agree? They agreed to be in the activity, but how much did they agree to deal? To deal. And we vacated in that case. Well, here, there's not an explicit agreement for the amount, and I think that's left for the district court to infer what was plausible. And here, what was plausible, it based it upon what was the amount in the stash and how much was distributed over the course of two months. And the inference that, okay, ounce distributions of roughly half, well, not, I guess it was 147 grams total, or 148 grams total of these five amounts that we know of, remaining with 600 grams in the garage attic, it was reasonable, it was plausible to infer that Silva knew and agreed to that conduct. And I know, Judge Elrod, you briefly, you asked about the conspiracy. He agreed to this conspiracy. And there is a distinction in the guidelines that the conspiracy, the acts of the conspiracy, and the amount attributable to the defendant are not one and the same. But here, I think this is a case where they are one and the same. It's clear that Silva knew that Galeas was involved in this activity. He approached Galeas to work. He then recruited a third person into that conspiracy. There's no evidence that anyone else was involved, and there's no evidence that any other transactions were made with other people other than these three people. And so I think here the— Why did the guidelines say don't, it's not? Well, I think the Smith case illustrates why the guidelines say don't go beyond, we can't be, the attributable conduct is not necessarily in line with the extent of the conspiracy, and Rivera contemplates that as well. And Rivera was a guilty verdict by a jury. It wasn't an agreed plea, or not an agreed plea, but a plea, a guilty plea to the conduct. And so I think there are cases, and rightfully there are cases, where the conspiracy conduct and the attributable amount to the defendant won't add up. But I think this is the case where it does. But the case law really talks about when you have a jointly undertaken criminal activity, which is what this is, and then you look at what the defendant's relevant conduct is. Right. Isn't that what we're really talking about? Yes. The defendant's relevant conduct is inclusive of the conduct of other people who are part of this jointly undertaken criminal activity.  And I think that's what the—I'm blanking on the case. I think Allen is the case that is the whole purpose of— U.S. v. Foy is one of them. Excuse me? U.S. v. Foy. The 1B1.3, the whole idea is to hold the defendant responsible for conduct of others. And that's what's occurring here. And the inference the district court made to get to that 755 grams was plausible and not clearly erroneous. You haven't mentioned anything about harmless error. Do you concede that harmless error doesn't work here? The only way—I will concede that the brief does not discuss under which prong we would go under. The only one that we could fall under was that second one. It doesn't work, does it? And it's—yeah. But I don't think that the court— That's good for your credibility. It doesn't work. No. No. There's just not enough of what the district court articulating. But I don't think the court has to get there. I think it can find that there was no error to begin with. If there are no further questions, we ask that you affirm. Thank you. We have— Thank you.  So I think in this court's case, we see pretty clearly that inferences can be cabin when there's more evidence as opposed to less. Let's imagine here that instead of having a controlled informant conducting surveillance on Galeas' house, all the steps that the investigators took here, they just heard that Mr. Galeas was distributing cocaine, got enough information to establish a probable cause, and stormed into his house, found the cocaine, found Mr. Silva there, found the guns. Then it might be a reasonable inference to say that Mr. Silva was a full partner with Mr. Galeas, especially if there weren't any statements made by any of the people arrested. But here we have a much more broad and developed investigation. Here we have the officers conducting surveillance, so they knew the relationship between Mr. Silva and Mr. Galeas. They knew that Mr. Silva was roommates with Mr. Ramon, wasn't living with Mr. Galeas. They knew that he came to the house each time that there was a job for Mr. Silva, and because Mr. Galeas made statements, they knew at least what he told them about Mr. Silva's involvement. And they testified that their evidence was that Mr. Silva had a very discreet role here, that Mr. Galeas had actually, before he realized he was working with law enforcement, told the confidential informant, I'm just going to send somebody to make this delivery because I want to minimize my exposure to any possible law enforcement. So here we have the government's agent telling us this was Mr. Silva's sole role, was to make these free street deliveries. It was a joint criminal activity. If you're going to deliver drugs, you've got to get them from somebody. Absolutely. You've got to get them from somebody who has them. Absolutely. You reasonably anticipate that somebody else is going to be in possession of a large quantity of drugs, and that's all part of this ongoing criminal activity. I agree that you would reasonably – And then if you're delivering them to somebody, and then he recruits someone else to make deliveries. Yes, sir. So now there's three people involved. I agree. It's a joint criminal activity, and each one is kind of dependent on the other one. He's dependent on somebody to supply drugs, and somebody else is dependent on him to deliver drugs. Well, I don't know that he's dependent on him to deliver drugs. He definitely made one of the deliveries himself, but he's decided to hire him. I'm not arguing that this wasn't – I'm not saying there's insufficient evidence of conspiracy here. When you're talking about relevant conduct, take into account the relevant – the conduct that you can reasonably anticipate will be the conduct of everybody else involved in this joint criminal activity. But I think the guidelines draw a distinction between a person who is kind of an independent contractor and a person who's a partner or an employee in the conspiracy with the hire person up. I think the guidelines tell us if Mr. Silva said, I don't want to help you protect this large cache of drugs. I don't want to help you buy it from your distributor. I don't want to help you make sure you sell all these 600 grams. I want you to have it because I want to be put on. He asked to be put on to work. That's true. He asked to be – he asked to join Mr. Silva in the scope of the conspiracy of making three deliveries. And he absolutely – he willingly did it. He asked to do it. He's guilty of conspiracy. That's why we pleaded to it. But the guidelines say because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the jointly undertaken criminal activity is not necessarily the same as the scope of the entire conspiracy. So here we have someone who joined – he conspired with Mr. Silva, no question. It was reasonably foreseeable to him that Mr. Silva had a larger cocaine business, no question. He even – the government's correct. He told another person about what he was doing for Mr. Galeas, and that other person did the same thing for Mr. Galeas that Mr. Silva was doing. That's all true. But telling another person about a job opportunity is not the same as jointly undertaking that work with them. I think about it in my own context. I started my career as an employee of the Federal Public Defender. Euphemism, job opportunity. I'm sorry? No. I'm just saying I appreciate your use of the euphemism, job opportunity. Oh, well. Selling drugs. Sure. But it's a job. It's what they're doing. But now I'm not –  I'm sorry? Career, maybe. It's a career, maybe. And I make a career as an independent contractor taking federal appointments. And if I tell a colleague of mine, you know, you might get on the CGA wheel as well, I don't suddenly expand the legal work that I'm doing. And I think the guidelines recognize that distinction between an independent contractor who has a limited stake in the conspiracy and someone who is an employee or a partner who actually cares about effectuating the entire distribution that's going on here. Thank you. Thank you, Mr. O'Neill. We appreciate the excellent arguments on both sides. And, Mr. O'Neill, we do note, as you noted in your argument, that you are a CJA attorney, and we appreciate your service to the court, which has been very well done, as is always the case. So thank you. Thank you. And, Ms. Durbin, your argument was very good, too. Thank you. The court will stand in recess until 9 a.m. tomorrow. Thank you.